IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs May 22, 2018

## STATE OF TENNESSEE v. JAMES B. COBB

**Appeal from the Circuit Court for Rhea County**
**No. 2016-CR-45     Thomas W. Graham, Judge**

_____

## No. E2017-01746-CCA-R3-CD

_____

Following a jury trial, the Defendant, James B. Cobb, was convicted of driving under the influence, a Class A misdemeanor.  He received a sentence of eleven months and twenty-nine days, suspended after forty-eight hours of incarceration.  On appeal, the Defendant argues that (1) the evidence was insufficient to support his conviction; (2) the trial court erred in excluding a defense expert's curriculum vitae from evidence; (3) the State made improper closing argument; and (4) the trial court erred in denying the Defendant's oral request for a jury instruction on character witnesses.  After a thorough review of the record and applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Howard L. Upchurch, Pikeville, Tennessee, for the appellant, James B. Cobb.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Mike Taylor, District Attorney General; and David Shinn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

The Defendant's conviction arises from a traffic stop after an officer observed the Defendant driving in the wrong lane and running off the road.  The Defendant was asked to perform field sobriety tests and consented to a blood test.  He was arrested and

subsequently indicted for driving under the influence ("DUI") in Count 1 and for failing to maintain a single lane in Count 2. After the State's case-in-chief at trial, the trial court entered a judgment of acquittal for failure to maintain a single lane, and the trial continued solely on the DUI charge.

### State's Proof

At approximately 11:50 p.m. on September 24, 2015, Sergeant Josh Miller, an officer with the Rhea County Sheriff's Department, was driving on Highway 27 when he noticed a white pickup truck "come across [a] turning lane, cross[] both lanes, hit the shoulder, [and] come back across both lanes." Sergeant Miller followed the truck onto Macedonia Road. As he caught up with the truck, he observed it "driving on both lanes," explaining that the truck was swerving into the "wrong lane." He also saw the truck run "completely o[ff] the road" when going around a sharp curve. Sergeant Miller gave the truck's license plate number to central dispatch and learned in response that the truck was registered to the Defendant.

Sergeant Miller activated the blue lights on his patrol car, and the Defendant immediately stopped. Although Sergeant Miller wrote in his report that the Defendant stopped in the middle of the road, he explained that he meant that the Defendant stopped "in the middle of his lane." Sergeant Miller approached the truck and noticed a scratch on the front driver's side fender, damage to the driver's side mirror, and that the driver's side window was busted. When Sergeant Miller asked what happened to the truck, the Defendant responded that he had hit a bird earlier that night.

Sergeant Miller "knew of" the Defendant and had previously heard him speak in a public setting, but he did not have a personal relationship with the Defendant. He noticed that the Defendant's speech was "a little slurred" and that he seemed "just a little off." As Deputy Bobby Joe Combs arrived at the scene, Sergeant Miller asked the Defendant to do a series of field sobriety tests. Sergeant Miller's patrol car was not equipped with a video camera, and the camera in Deputy Combs's car was inoperable, so Deputy Combs used his cellular telephone to record the Defendant while he performed the field sobriety tests.

The Defendant was first asked to perform the horizontal gaze nystagmus test, where he was asked to stand with his feet together, hands to his side, and to follow a pen with only his eyes as Sergeant Miller moved the pen back and forth. Sergeant Miller testified that he looked for stability and whether the Defendant was listening to instructions while performing the test. At first, the Defendant did not follow the pen with

his eyes, but after Sergeant Miller asked him again to follow it, he began doing so.[1]  The Defendant was also asked to do a walk-and-turn test, where he was asked to walk heel-to-toe while counting out loud for nine steps, turn, and walk back nine additional steps. Before beginning this test, Sergeant Miller asked the Defendant if he had any medical problems, and the Defendant said that he had gout but that it was not flaring up at that time.  Sergeant Miller stated that there were several times when the Defendant began performing the test before being instructed to do so, which demonstrated that he was not listening to instructions.  He missed his heel-to-toe "a couple of times," and he took ten or eleven steps back, shuffling his last two to three steps.  The Defendant was then asked to stand on one leg and "count 1,001; 1,002; 1,003" and so on until instructed to stop. The Defendant was unable to perform and "just gave up," stating that he did not have any balance.  He was asked to lift his arms to his sides while keeping his feet together, tilting his head back, and closing his eyes.  While standing in this position, he was asked to touch his finger to his nose.  He was also asked to count to thirty seconds in his head while Sergeant Miller timed him.  Sergeant Miller noted that the Defendant finished counting in ten seconds real time.

Sergeant Miller's overall conclusion, based on his seven to eight years of experience, was that the Defendant performed "very poorly" on the tests.  The video recording of the tests was admitted into evidence and played for the jury.  The video also showed Sergeant Miller speaking with the Defendant before he was put into the patrol car.  Sergeant Miller testified that he was explaining to the Defendant that he could not let him drive away after observing his driving.  Sergeant Miller stated that the Defendant admitted to running off the road.  He testified that although he did not consider the Defendant's age, he concluded that the Defendant was under the influence based on "the whole situation, his driving, his speech, the way he acted, [and] the tests [them]selves."

A video was also admitted showing Sergeant Miller reading the implied consent form to the Defendant while the Defendant was sitting in the back of a patrol car.  The Defendant laid his head back on the seat and closed his eyes.  Sergeant Miller stopped reading to ask the Defendant if he was listening because "[h]e appeared to have dozed off."  The Defendant responded that he was listening, Sergeant Miller finished reading

---

[1] We note that Sergeant Miller did not testify about the results of the test or any signs of nystagmus, which "is an involuntary jerking movement of the eye either as it attempts to focus on a fixed point or as it moves to one side." *State v. Murphy*, 953 S.W.2d 200, 202 (Tenn. 1997) (holding that the results of a horizontal gaze nystagmus are admissible only with expert testimony).  Instead, he testified only about the Defendant's ability to follow directions when administered the test. *See State v. Darrell E. Childress*, No. M2016-00799-CCA-R3-CD, 2016 WL 7468206, at *6 (Tenn. Crim. App. Dec. 28, 2016) (holding the trial court properly admitted officer testimony regarding the defendant's failure to follow instructions when the officer did not testify regarding the results of the test itself), *no perm. app. filed*.

the form, and the Defendant signed and dated the form. Sergeant Miller testified that he asked for a blood test rather than a breathalyzer test because there were no signs of alcohol use by the Defendant. The Defendant was transported to the emergency room, where his blood was drawn.

On cross-examination, Sergeant Miller acknowledged he did not stop the truck until after he had received information that the truck was registered to the Defendant. He recalled contacting Deputy Combs after receiving such information but did not recall whether Deputy Combs asked if the truck was a "white Ford F-150," whether he responded affirmatively, and whether Deputy Combs said, "[T]hat's him." He acknowledged he spoke with the chief deputy before stopping the truck but did not recall the chief deputy stating, "[W]e finally got him." He testified that neither the chief deputy nor Deputy Combs gave any instructions to be on the lookout for the Defendant.

Sergeant Miller agreed there were no streetlights on Macedonia Road, that the center yellow line was faded, and that there was no shoulder on the road. He also acknowledged there were no other vehicles driving on the road. He agreed that the Defendant immediately stopped after he activated his blue lights and that it was a "good decision" for the Defendant to stop his truck in his lane on the straight part of the road. Sergeant Miller agreed that the Defendant produced his driver's license when requested, that his license was valid, that he stayed in his truck when asked to do so, and that he did not attempt to leave when Sergeant Miller returned to his patrol car. He stated that the Defendant had "to hold the door when he got out" of his truck but that he did not hold on to anything or require any assistance while standing and walking. He also acknowledged that the Defendant said he was sleepy both when he was initially stopped and when he was read the implied consent form. He did not believe he had seen the Defendant within the six months preceding the stop.

A recording of Sergeant Miller's communications with dispatch and Deputy Combs prior to the stop was admitted into evidence. After Sergeant Miller received the information from dispatch that the truck belonged to the Defendant, Sergeant Miller asked Deputy Combs to use a private radio channel, where only Deputy Combs and Sergeant Miller could hear each other. Deputy Combs asked Sergeant Miller what type of vehicle he was calling about, and after Sergeant Miller described the truck, Deputy Combs responded, "Yeah, I think that's him." Sergeant Miller testified that he did not know why Deputy Combs would respond that way, explaining "he must not have heard the tag." The recording also showed that the chief deputy asked Sergeant Miller to call him before he stopped the truck. Defense counsel asked Sergeant Miller if the chief deputy said, "Looks like we got him," but Sergeant Miller explained that the chief was merely asking, "Did you copy that?"

On redirect examination, Sergeant Miller clarified that he did not decide to follow the Defendant's truck merely because he knew the Defendant was driving. He explained that he stopped the truck because of the driving he observed and not because he learned it belonged to the Defendant.

Deputy Bobby Joe Combs's testimony was consistent with that of Sergeant Miller. He had previously spoken to the Defendant but did not know him personally. He did not conduct the field sobriety tests or talk to the Defendant, but he stood at Sergeant Miller's patrol car and recorded the Defendant while he performed the tests and while he was read the implied consent form. He noted that the Defendant's speech was "very slurred" and that he appeared "very tired" and "just slow." He described the Defendant as "falling asleep or passing out" while Sergeant Miller read him the implied consent form. He stated that he had not been told to be on the lookout for the Defendant that night and that he was not told to arrest the Defendant that night because of who the Defendant was.

On cross-examination, Deputy Combs acknowledged that had the video camera in his patrol car been operable, it would have "not [been] subject to … moving around or jerking …." He agreed that he heard Sergeant Miller give the license plate number to dispatch and heard dispatch respond with the Defendant's information. He did not recall whether he had seen the Defendant in the six months preceding the stop, and he was not aware that the Defendant had undergone surgery during that time.

Special Agent Regina Aksanov, from the Tennessee Bureau of Investigation ("TBI") toxicology unit, provided expert testimony about her testing of the Defendant's blood. The Defendant's blood was first tested for alcohol, and after those results came back as negative, the blood was given to Special Agent Aksanov for further drug testing. She testified that the Defendant's blood tested positive for both Amphetamine and Clonazepam. She explained that every drug has a therapeutic range, which is the amount needed for the drug to have the desired therapeutic effect on a person. Side effects can be exhibited when a drug is below, within, or above its therapeutic range.

The Defendant's blood tested positive for 0.14 micrograms of Amphetamine per milliliter, which Special Agent Aksanov concluded was above its therapeutic range of 0.03 to 0.11 micrograms per milliliter. She stated that although tolerance to a drug can occur after taking a specific drug consistently over a period of time, this does not necessarily mean that the drug should be given over the therapeutic level, as the therapeutic range is large enough to accommodate for tolerance. She explained that Amphetamine is a stimulant to the central nervous system and that its side effects include "feeling jittery, being very awake[,] … feeling nervous, [and] feeling dizzy." She further testified that an individual "coming off of" a stimulant such as Amphetamine can become very tired, sleepy, and fatigued.

The Defendant's blood tested positive for 34 nanograms of Clonazepam per milliliter, which was within its therapeutic range of 7 to 75 nanograms per milliliter. Special Agent Aksanov explained that Clonazepam is a depressant to the central nervous system and "may cause drowsiness, fatigue, confusion, dizziness, sedation, [and] blurred vision." The Defendant's blood also tested positive for 20 nanograms of 7-Amino Clonazepam per milliliter. Special Agent Aksanov clarified that 7-Amino Clonazepam is a metabolite from Clonazepam. Because there is no therapeutic range associated with this particular metabolite, she was unable to determine whether the 20 nanograms found in the Defendant's blood were significant. She further explained that although Clonazepam and Amphetamine have opposite effects, they do not completely negate one another.

On cross-examination, Special Agent Aksanov agreed that there was four to five times more Amphetamine than Clonazepam in the Defendant's blood. She stated that the half-life, which is "the time it takes for about half of the amount of the drug to be metabolized through the system," for Amphetamine is seven to thirty-four hours while the half-life of Clonazepam is nineteen to sixty hours. She also agreed that the presence of 7-Amino Clonazepam in the Defendant's blood indicated that Clonazepam had been in the Defendant's system for a period of time.

**Defense Proof**

Dr. Glen Edward Farr, licensed pharmacist and professor of clinical pharmacy, provided expert testimony on behalf of the defense. The State objected to the admission of Dr. Farr's curriculum vitae as hearsay, which was sustained by the trial court. The court held, however, that Dr. Farr could testify about anything contained within the curriculum vitae. Dr. Farr then explained to the jury his education, licensure, and his prior experience both practicing pharmacy and teaching. He stated that he previously instructed law enforcement officers on drugs and pharmacology and that he had authored between forty and fifty articles, book chapters, and textbooks, several of which were about drug interactions. He also listed his professional recognitions and awards.

Dr. Farr testified that he reviewed the TBI's toxicology report. He stated that the presence of the 7-Amino Clonazepam showed that the drug had been in the Defendant's system for a period of time. He explained that the toxic level of Amphetamine is 500 nanograms but that there were only 140 nanograms, or 0.14 micrograms, detected in the Defendant's blood. He stated that taking a stimulant and a depressant together would not completely negate but would lower the effects of both drugs. He further explained that Amphetamine would not increase the effects of Clonazepam on the central nervous system. He said if he "had to predict a winner" between the effects of the two drugs, then

- 6 -

Amphetamine would have had greater effects on the Defendant. He also explained that unless an individual had decreased liver function or gastrointestinal issues as a result of age, then age should not be a factor in the therapeutic effect of either Clonazepam or Amphetamine. He stated that there was no way to quantify the amount of a drug taken or when it was taken based on the results of a blood test.

On cross-examination, Dr. Farr did not dispute the results of the toxicology report and agreed that he did not review the Defendant's medical records in forming his opinion. He stated that he learned the Defendant was taking Clonazepam for anxiety and Amphetamine because he had trouble focusing after being diagnosed with cancer. He did not speak to the Defendant about his medical conditions. He reviewed the Defendant's prescription records for Clonazepam from 2013 and September 2014 but did not review any records for an Amphetamine prescription. He explained that a general low dose would be 30 milligrams of Amphetamine and 2 to 8 milligrams of Clonazepam. The Defendant's prescription for Clonazepam was 2 milligrams twice per day. Dr. Farr agreed that if an individual went six months or a year without taking any Clonazepam, then the effects would be greater upon resuming use of Clonazepam. He also agreed that if an individual were to take a 2 milligram dose of Clonazepam after consistently taking Amphetamine for several months while not taking any Clonazepam, then the Clonazepam would have a greater effect than the Amphetamine. He clarified that taking Amphetamine or Clonazepam would not be the "primary determining factor of falling asleep at 11:45 at night," further explaining that he would focus more on sleepiness and drowsiness than on the drugs themselves. He stated that had the Defendant taken Clonazepam a year before his arrest, he would have had "[n]ot much, but some" tolerance. He agreed if an individual was already drowsy, taking Clonazepam would increase that drowsiness. When asked about the warning in the Clonazepam literature, he responded, "The warning specifically says do not operate [an] automobile or machinery until you find out how this drug affects you as an individual."

Mr. Joe Carr testified that he had known the Defendant since 2008 both professionally and personally. The Defendant had arranged for Mr. Carr to speak at a political event on September 24, 2015. Mr. Carr and his wife arrived around 6:00 p.m., had dinner with the Defendant, and were escorted by the Defendant to their car a little after 8:00 p.m. Mr. Carr described the Defendant's demeanor as "[n]othing out of the ordinary, given the circumstances." He explained that the Defendant had been ill but that he did not know the details of his illness. The Defendant did not exhibit signs of intoxication, did not stagger, and only appeared "a little tired." When asked about his opinion of the Defendant's truthfulness, Mr. Carr said the Defendant "will tell the truth and be quite honest, even when it's not to his advantage."

Mr. Redford Norman testified that he had known the Defendant since 1984. He recalled seeing the Defendant at a restaurant during the fall of 2015 but could not recall the specific date. He observed that the side mirror on the Defendant's truck was broken and that it had shattered the driver's side window. The Defendant borrowed a broom and dustpan from the restaurant and tried to clean some of the glass from the inside of his truck. Mr. Norman described the Defendant as "a little nervous" because of the shattered window. He observed no signs of intoxication or impairment and did not see the Defendant take any medications while at the restaurant. He could understand the Defendant when he spoke, and the Defendant appeared to be walking normally. When asked his opinion regarding the Defendant's truthfulness, Mr. Norman responded, "I've never known him to be anything but honest." On cross-examination, Mr. Norman said the Defendant left the restaurant around 9:30 p.m. and that he did not see the Defendant again that evening.

Mr. John Mincy testified that he lived on Macedonia Road and had known the Defendant for eleven years. He described the road as "narrow" and "winding" with a faded yellow center line. He considered the Defendant to be "an honest individual." On cross-examination, Mr. Mincy agreed that Macedonia Road was dangerous, especially at night. He clarified that the center line was "[b]arely visible" and agreed that he was not at the scene when the Defendant was stopped.

Ms. Suzanne Cobb, the Defendant's wife, testified that prior to September 2015, the Defendant had been diagnosed with neuropathy, which she explained "is a deadening of the nerves in his feet." He had surgery in March 2015, but he did not have "a good outcome." As a result of the surgery, his vagal nerve was paralyzed. He would go two to three days without sleep, he could not eat, and he had additional gastrointestinal issues as a result. Ms. Cobb described the Defendant as exhausted all the time. She explained that the Defendant began taking Amphetamine in the fall of 2012 for attention deficit disorder. He began taking Clonazepam in 2008 to help with his fear of public speaking. He had to stop taking Clonazepam when he had his surgery but resumed taking it in August 2015 to help with his sleep issues.

During the week of September 24, 2015, the Defendant had not been sleeping. Ms. Cobb went out of town on September 23, and the Defendant had not slept in two days by that point. She spoke with the Defendant by telephone after he left the political event on September 24 but did not notice anything different about his speech. She testified that she had reviewed the video that Deputy Combs recorded of the Defendant's field sobriety tests. She did not consider any of the Defendant's movements as unusual for him at that time of night. She said his voice sounded as it normally did, and she did not believe his speech was slurred. She stated that seeing the Defendant with his head back and eyes closed while he was read the implied consent form was not unusual. She

explained that he often did the same thing when he was riding with her in a vehicle. She stated that the Defendant did not appear to be asleep. She further testified that the Defendant had never abused his prescription medications and that she had never seen him impaired from his use of Clonazepam.

The Defendant testified that he was sixty-five years old when he was arrested. He explained that he had been taking 30 milligrams of Amphetamine three times per day since 2012. He began taking 2 milligrams of Clonazepam per day in either 2008 or 2009, stopped taking it in January 2015, and resumed taking it in August 2015. He testified that after his surgery, he would go two to three days without sleep and that he was "very, very happy" when he was able to get five hours of sleep.

The Defendant testified that he took 2 milligrams of Clonazepam around 10:00 p.m. on September 23, 2015. On September 24, he took Amphetamine as prescribed, but he did not take any additional Clonazepam. He did not experience any side effects, including impairment or loss of balance. He stated that he left the political event around 8:45 p.m. and decided to go to a restaurant. As the Defendant entered the interstate, the side mirror of his truck "was smacked by something," which caused the spring-loaded mirror to snap toward the driver's side window and shatter it. He believed his mirror "clipped' an "orange diamond shaped road construction" sign. He agreed that he was focused on looking for oncoming traffic at the time and that he could have been hit by something from another vehicle driving by. He explained that the construction sign "was in the way … where it shouldn't have been" and that the sign was "unlit." He said that there was a streak on his front fender around the same height as the mirror but that it "buffed out." He maintained that he did not tell Sergeant Miller that he had been hit by a bird. The Defendant arrived at the restaurant, where he saw Mr. Norman, around 9:15 or 9:30 p.m. He got a broom and dustpan from the restaurant and tried to clean some of the glass that had fallen inside his truck. He left the restaurant and went to Walmart to shop and get gas around 10:30 p.m., which was corroborated by a gas receipt entered into evidence.

The Defendant denied driving onto the shoulder of the road on Highway 27. He did not notice a car behind him until after he turned onto Macedonia Road. He stated that Macedonia Road had a center line "[i]n places, and even in those places, it's very[,] very faint." He testified that unless there is a "blind hill or a curve, or another vehicle," then you stay in the center of the road because the lines are not clear. He did not see any cars approaching from the opposite direction while driving on Macedonia Road, and he did not see any other vehicles on the road that night. The Defendant affirmed that there is not an area on Macedonia Road where one could take two wheels off the road without hitting anything. He acknowledged that one wheel on the passenger's side went off the road for

a second while Sergeant Miller was following him, but he denied that two wheels ever left the road.

The Defendant explained that he was "[j]ust tired" while doing the field sobriety tests, which he told Sergeant Miller "twice, maybe three times." When performing the field sobriety tests, he was facing the headlights from Sergeant Miller's patrol car and could not see Deputy Combs because of the lights. He believed that Sergeant Miller told him not to begin the tests before being instructed to do so, but there were "a couple of times" when Sergeant Miller "hesitated long enough that [the Defendant] assumed that was [his] signal to start." When asked to balance on one foot, the Defendant told Sergeant Miller that he did not have any balance due to his gout. The Defendant did not think to tell Sergeant Miller about his neuropathy. He did not believe his inability to perform that test was caused by his use of Clonazepam. He explained that when Sergeant Miller instructed him to count to thirty, he did not remember Sergeant Miller telling him to count to thirty *seconds*.

The Defendant stated that he did not go to sleep while in the backseat of the patrol car. He agreed that it was normal for him to lean back and close his eyes while riding in a vehicle he was not driving. He stated that he heard Sergeant Miller read the implied consent form, that he had no trouble signing the form, and that he consented to taking a blood test.

The jury returned a guilty verdict for the DUI charge. The trial court subsequently sentenced the Defendant to a sentence of eleven months and twenty-nine days, suspended following the service of forty-eight hours. The Defendant timely appeals.

## ANALYSIS

On appeal, the Defendant asserts that the evidence was insufficient to support his conviction. He also argues that the trial court erred in excluding Dr. Farr's curriculum vitae, that the State made improper closing argument, and that the trial court erred in excluding a jury instruction on character witnesses.

### I. Sufficiency of the Evidence

When a defendant challenges the sufficiency of the evidence, this court must determine whether the evidence is sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). The appellate court examines the relevant statute to determine the essential elements for the offense and analyzes the evidence admitted at trial to determine whether each element is adequately supported. *State v. Stephens*, 521 S.W.3d 718, 723-24 (Tenn. 2017) (citations omitted). The court

determines "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 724 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The standard of review remains the same regardless of whether the conviction is based upon direct or circumstantial evidence. *Id.* (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)). "'[T]he State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom.'" *Id.* (quoting *State v. Harris*, 839 S.W.2d 54, 75 (1992)). This court does not reweigh the evidence. *Id.* (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)). Instead, "'a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts' in the testimony in favor of the State." *Id.* (quoting *Harris*, 839 S.W.2d at 75). The conviction replaces the presumption of innocence with a presumption of guilt. *Id.* (citing *Evans*, 838 S.W.2d at 191). On appeal, the defendant has the burden of demonstrating why the evidence is insufficient to support the verdict. *Id.* (citing *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982)).

Tennessee Code Annotated section 55-10-401(a)(1) makes it an offense to drive a vehicle while "[u]nder the influence of any intoxicant, … controlled substance, controlled substance analogue, drug, substance affecting the central nervous system, or combination thereof that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of oneself that the driver would otherwise possess."

The Defendant asserts that the evidence showed that the Defendant was tired and sleep deprived and that the Amphetamine in the Defendant's system would have lowered the effects of the Clonazepam. The Defendant also asserts that the Defendant's driving was not recorded by Sergeant Miller and that there was no physical evidence of impaired driving. Viewed in a light most favorable to the State, the facts established that Sergeant Miller observed the Defendant drive onto the shoulder of the road, in the wrong lane, and off the road. Sergeant Miller noticed that the Defendant's truck was damaged, which the Defendant explained was from hitting a construction sign or bird. Sergeant Miller testified that the Defendant's speech was slurred and that he performed poorly in the field sobriety tests, testimony which was corroborated by Deputy Combs's testimony and video evidence. The Defendant's blood test showed that he had both Amphetamine and Clonazepam in his system, and Special Agent Aksanov testified that Amphetamine is a central nervous system stimulant and that Clonazepam is a central nervous system depressant. The side effects of Clonazepam include drowsiness, fatigue, confusion, dizziness, sedation, and blurred vision. Both Dr. Farr and Special Agent Aksanov testified that the Amphetamine and Clonazepam would diminish the other's effects but

would not completely negate each other. Although the Defendant claimed that the Clonazepam did not affect him and that he was merely sleep deprived, the jury's guilty verdict accredits the testimony of the State's witnesses. *See Stephens*, 521 S.W.3d at 724. Based on the evidence presented, a rational trier of fact could conclude that the effects of the Clonazepam and Amphetamine impaired the Defendant's ability to operate a motor vehicle. *See id.*

## II. Admissibility of Expert's Curriculum Vitae

The Defendant argues that the trial court erred in concluding that Dr. Farr's curriculum vitae ("CV") was inadmissible hearsay. Tennessee Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay evidence is generally inadmissible unless it falls under an exception. Tenn. R. Evid. 801.

We hold that the trial court did not err in excluding the written CV document from evidence as hearsay, as it is an out-of-court statement offered to prove the truth of the matter asserted — that Dr. Farr had accomplished everything contained therein. The trial court was further correct in allowing Dr. Farr to testify about any and all of the information contained within the CV document because Dr. Farr had personal knowledge of the information and such information was material and relevant.

This may be a case where one wins the battle but loses the war, in that the State was successful in keeping a piece of paper out of the jury's hands but could not prevent the witness from testifying about all of the information contained within the CV document. The Defendant had the right to present Dr. Farr's qualifications to the jury. *See Bryant v. State*, 539 S.W.2d 816, 819 (Tenn. Crim. App. 1976) (holding that the court did not err "in allowing over objection … rather lengthy testimony to as [expert's] qualifications" when the parties stipulated to the fact the witness was qualified as an expert). Parties are not prevented from stipulating to the admission of a written CV document. *See Mahnke v. Washington Metro. Area Transit Auth.*, 821 F. Supp. 2d 125, 154 (D.D.C. 2011) (order); *see also Michael Jones v. Am. Council on Exercise*, No. H-15-3270, 2016 WL 6084636, at *2 (S.D. Tex. Oct. 18, 2016) (noting that parties may stipulate to the admission of an expert's CV and that a court may still rely on the CV to determine whether the expert is qualified); *Larue Sheffield v. State Farm Fire & Cas. Co.*, No. 5:14-cv-38, 2016 WL 3548550, at *8 (S.D. Ga. June 23, 2016) (order) (noting that parties may stipulate to the admission of an expert's CV even though it constitutes hearsay); *Jamie McBride v. Kmart Corp.*, No. 14-CV-41-SWS, 2015 WL 13545913, at *3 (D. Wyo. Jan. 14, 2015) (order) (observing that expert CVs are routinely admitted into evidence); *Curtis Alexie v. United States*, No. 3:05-cv-00297-JWS, 2009 WL 160354, at

*1 (D. Alaska Jan. 21, 2009) (order) (encouraging the parties to stipulate to the admission of the CVs). Thus, this is an example of choosing one's poison: stipulating to the admission of a written CV or insisting that the information be provided through testimony.

Because the trial court did not err in excluding the written CV document and in allowing Dr. Farr to provide live testimony about his credentials, the Defendant is not entitled to relief.

### III. Closing Argument

The Defendant asserts that the prosecutor improperly argued facts outside the record that inflamed the jury's passions during closing argument. He acknowledges that he failed to contemporaneously object during the State's closing argument but maintains that the comments constitute plain error. He specifically challenges the prosecutor's comments that Sergeant Miller's act of taking the Defendant off the road protected other drivers, that a person driving in the opposite direction as the Defendant "is probably thankful that [Sergeant Miller] took [the Defendant] off the highway," and that impaired individuals can still pump gas and go inside stores.

The defendant has the burden of showing "'that the trial court committed plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial.'" *State v. Martin*, 505 S.W.3d 492, 505 (Tenn. 2016) (quoting *State v. Michael Smith*, 492 S.W.3d 224, 232-33 (Tenn. 2016)). For this court to grant relief for plain error, five factors must be established: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice. *State v. Donald Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (citing *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be present, and when it is clear from the record that at least one of these factors cannot be established, the court need not consider the remaining factors. *Id.*

"[I]t has long been recognized that '[t]he question of whether to object to improper argument is a tactical decision for counsel.'" *State v. Charles Owens*, No. M2005-02571-CCA-R3-CD, 2007 WL 1094136, at *6 (Tenn. Crim. App. Apr. 12, 2007) (quoting *State v. Compton*, 642 S.W.2d 745, 747 (Tenn. Crim. App. 1982)). Indeed, it is often a good tactic to allow the State to make inflammatory arguments without any objection because, on occasion, such argument "creates sympathy on the part of the jury for the defendant and animosity toward the State." *Compton*, 642 S.W.2d at 747. Here, the Defendant has not shown that his failure to object was not tactical.

Moreover, the Defendant has not established that a substantial right was adversely affected. To show that a substantial right has been adversely affected, the appellant must show that the error affected the outcome of the trial proceedings. *State v. Timothy Ryan Baggett*, No. M2003-02300-CCA-R3-CD, 2005 WL 65541, at *5 (Tenn. Crim. App. Jan. 5, 2005) (citing *United States v. Olano*, 507 U.S. 725, 732-37 (1993)).

Our supreme court has recognized that "closing argument is a valuable privilege that should not be unduly restricted." *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001). Such arguments "serve 'to sharpen and to clarify the issues that must be resolved in a criminal case by enabling the opposing lawyers to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury.'" *State v. Hawkins*, 519 S.W.3d 1, 47 (Tenn. 2017) (quoting *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008)). Accordingly, "the trial court has discretion in controlling the course of arguments and will not be reversed absent an abuse of that discretion." *State v. Reid*, 164 S.W.3d 286, 321 (Tenn. 2005). Prosecutors are given "'great latitude in both the style and the substance of their arguments.'" *Hawkins*, 519 S.W.3d at 47 (quoting *Banks*, 271 S.W.3d 90, 130-31 (Tenn. 2008)). However, "prosecutors should not lose sight of their duty to seek justice impartially and their obligation 'to see to it that the defendant receives a fair trial.'" *Id.* at 47-48 (quoting *Banks*, 271 S.W.3d at 130-31). A prosecutor "should not use arguments calculated to inflame the passions or prejudice the jury" or "intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge." *State v. Willis*, 496 S.W.3d 653, 753-54 (Tenn. 2016); *see also Banks*, 271 S.W.3d at 131.

Although the Defendant argues that the prosecutor improperly argued that Sergeant Miller protected other drivers by arresting the Defendant and that impaired individuals have the ability to pump gas and go inside a store, the Defendant has not shown that these statements affected the outcome of the trial proceeding in light of the evidence presented at trial. *See Timothy Ryan Baggett*, 2005 WL 65541, at *5. Accordingly, we conclude that the prosecutor's statements do not rise to the level of plain error.

## IV. Jury Instruction

The Defendant argues that the trial court erred in excluding a jury instruction on character evidence from the jury charge. The State responds that the Defendant has waived the issue by failing to file a written request for the jury instruction.

Tennessee Rule of Criminal Procedure 30(a)(1) states, "At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party *may* file written requests that the court instruct the jury on the law as set forth in the

requests." (emphasis added). Rule 30(a)(1) also allows the court to "entertain requests for instructions at any time before the jury retires to consider its verdict." We note that the language in Rule 30(a)(1) is permissive rather than mandatory.

Although the Defendant made an oral request for a jury instruction, he did so after the trial court read the jury instructions and asked if there were any additional requests from the State and defense. The State argued that the Defendant failed to file a written request for the character witness jury instruction, but the trial court stated that the Defendant's failure to do so was "not a big deal" and determined that the jury instructions adequately instructed how the jury is to consider witness testimony and credibility. The Defendant then subsequently raised the issue in his motion for a new trial. *See State v. Leath*, 461 S.W.3d 73, 107 (Tenn. Crim. App. 2013) (reviewing the omission of a special jury instruction only for plain error after the defendant failed to file a written request and failed to raise the issue in his motion for new trial). *But see State v. Joseph Harris*, No. W2015-00500-CCA-R3-CD, 2016 WL 2594964, at *9 (Tenn. Crim. App. May 3, 2016) (reviewing only for plain error where the defendant made an "oral and non-specific request for a special jury instruction" without mentioning whether the issue was raised in his motion for new trial). Regardless of the review given in this case, the Defendant is not entitled to relief.

The Defendant specifically asserts that absent an instruction on character witnesses, the jurors lacked guidance on the purpose of character testimony, the application of such testimony to the case, and the use of such testimony in analyzing the Defendant's own testimony. The jury was instructed, however, that when forming an opinion on witness credibility, they are to "look to the proof, if any, as to the general character of the witness, [and] the evidence if any, of the witness' reputation for truth and veracity[] …." The jury was also instructed that the Defendant's "credibility is to be determined by the same rules by which the credibility of all other witnesses is determined …." We thus conclude that these instructions provide adequate guidance to the jury in how to consider defense witnesses' testimony about the Defendant's character trait for truthfulness and honesty. The Defendant is accordingly not entitled to relief.

## CONCLUSION

Based on the foregoing, the judgment of the trial court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE

- 15 -